**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**Savannah Division**

| | | |
|---|---|---|
| **TMX FINANCE LLC and**<br>**TITLEMAX FUNDING, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No. _____** |
| **vs.** | ) ) ) | |
| **WENDY SPICHER, in Her Official**<br>**Capacity as Secretary of the Pennsylvania**<br>**Department of Banking and Securities,** | ) ) ) ) ) | |
| **Defendant.** | ) ) ) ) | |

**COMPLAINT**

Plaintiffs TMX Finance LLC ("TMX Finance") and TitleMax Funding, Inc. ("TitleMax Funding") (collectively "Plaintiffs"), by and through their undersigned attorneys, for their Complaint against Defendant Wendy Spicher (the "Secretary" or the "Defendant"), in her official capacity as Secretary of the Pennsylvania Department of Banking and Securities (the "Department"), allege as follows:

**PRELIMINARY STATEMENT**

1.     This is a case premised on the concept of individual state sovereignty and the right of Georgia to regulate business within its territorial and sovereign borders, free from regulatory overreach by its sister states like Pennsylvania. It challenges the Pennsylvania Secretary's ongoing attempt to regulate commercial activity that takes place inside Georgia and wholly outside the Commonwealth of Pennsylvania in violation of the Commerce Clause, the

Due Process Clause, the Full Faith and Credit Clause, and the Equal Protection Clause of the United States Constitution.  U.S. Const. art. I, § 8; U.S. Const. art. IV, § 1; U.S. Const. amends. XIV.  This action is necessary to address and protect against such unconstitutional overreach and abuse.  *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 263 (2017) ("The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister States,") (alteration in original) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)); *see also* Ga. Code § 50-2-20 ("The jurisdiction and sovereignty of the State extend to all places within the boundaries thereof.").

2.      On June 7, 2024, the Department issued TMX Finance and TitleMax Funding an investigative subpoena (the "June 2024 Subpoena").  The June 2024 Subpoena is attached hereto as **Exhibit 1**.  It seeks voluminous records pursuant to the Department's purported authority to investigate and regulate Plaintiffs for potential violations of the Pennsylvania Loan Interest and Protection Law, 41 Pa. C.S. §§ 101-605 ("LIPL"), and the Consumer Discount Company Act, 7 Pa. C.S. §§ 6201-6221 ("CDCA").  Given the nature of the Plaintiffs' business, neither of these statutes would govern Plaintiffs' businesses even if they did (which they do not) take place within the Commonwealth of Pennsylvania.

3.      Next, on June 14, 2024, the Secretary, through her agents in the Department, issued to Plaintiffs an Order to Show Cause seeking to impose $52 million in civil penalties on Plaintiffs and to require Plaintiffs to refund borrowers for loans originated and serviced wholly outside Pennsylvania by Plaintiffs' corporate affiliates and/or subsidiaries.  The Order to Show Cause is attached hereto as **Exhibit 2**.

4.      TMX Finance is a Delaware limited liability company and TitleMax Funding is a Florida corporation.  Both entities, however, have their principal place of business in Savannah,

Georgia. Both TMX Finance and TitleMax Funding are companies within the much broader CCF Holdings, LLC corporate family tree, which has hundreds of corporate entities. These particular entities' roles are singular and distinct. TMX Finance is the parent company of the various "TitleMax" entities (among others) and, historically, was solely a parent holding company that prepared consolidated financials, taxes, and, at times, secured credit for its sibling operating entities. TitleMax Funding's sole role is that it owns bank accounts. To be certain, neither TMX Finance nor TitleMax Funding do or have ever made loans anywhere, including to Pennsylvania consumers.

5. In addition, both TMX Finance and TitleMax Funding operate entirely outside of Pennsylvania.

6. TMX Finance and TitleMax Funding do not, and have never, conducted business in Pennsylvania, owned or rented real property in Pennsylvania, or controlled bank accounts or other assets in Pennsylvania.

7. The threatened extraterritorial imposition of Pennsylvania's laws on Plaintiffs violates the Commerce Clause embedded in Article I of the U.S. Constitution, the Due Process Clause and Equal Protection Clause embedded in the Fourteenth Amendment to the U.S. Constitution, and the Full Faith and Credit Clause embedded in Article IV of the U.S. Constitution.

8. Accordingly, TMX Finance and TitleMax Funding bring this action against the Secretary under 42 U.S.C. § 1983 seeking (a) a declaratory judgment that the U.S. Constitution's Commerce Clause, Due Process Clause, Full Faith and Credit Clause, and Equal Protection Clause prohibit the Secretary from enforcing against TMX Finance and TitleMax Funding the two Pennsylvania statutes for loans originated exclusively outside of Pennsylvania by TMX

3

Finance subsidiaries; and (b) a permanent injunction barring the Secretary from taking any further action against TMX Finance and TitleMax Funding.

**THE PARTIES**

9.      Plaintiff TMX Finance is a Delaware limited liability company with a principal place of business in Savannah, Georgia.

10.      TMX Finance is a company within the much broader CCF Holdings, LLC corporate family tree, which has hundreds of corporate entities.  It is the parent holding company and files consolidated taxes for the various TitleMax subsidiaries.

11.      Plaintiff TitleMax Funding is incorporated in Florida and has a principal place of business in Savannah, Georgia.  TitleMax Funding is registered to do business in Georgia.

12.      TitleMax Funding is an entity that is wholly owned by TMX Finance to centralize the financial operations of its subsidiaries.  It holds a majority of the bank accounts for the various TitleMax subsidiaries.

13.      TitleMax Funding's registered agent is located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

14.      Defendant Spicher is the chief executive and administrative officer of the Department.  She administers and is responsible for the policies established for the Department by or pursuant to applicable Pennsylvania legislation.  The Secretary exercises managerial control over the work carried out by the Department and its agents, including by the Department's deputies, supervisors, examiners, and administrative personnel.

**JURISDICTION AND VENUE**

15.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

4

16.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted in the Complaint occurred in this district.

## FACTUAL ALLEGATIONS

### Overview of TMX Finance and TitleMax Funding's Businesses

17.     TMX Finance is the parent holding company of TitleMax Funding.

18.     TMX Finance does not and has never provided loans to consumers.  Instead, TMX Finance's main purpose is to perform certain financial and accounting functions for its subsidiaries.  TMX Finance files consolidated taxes as a parent company with an associated address in Savannah, Georgia.

19.     All business activities associated with TMX Finance have always occurred in either Savannah, Georgia or Carrollton, Texas.

20.     TitleMax Funding is wholly owned by TMX Finance to centralize the financial operations of carried out by certain TitleMax entity subsidiaries that do make or facilitate loans or pawns to consumers (the "TitleMax Lending Entities").

21.     Like TMX Finance, TitleMax Funding does not and has never originated or brokered loans to consumers.  Rather, TitleMax Funding merely acts as the holder of accounts used to fund business activities and operations carried out by the TitleMax Lending Entities and other subsidiaries.  All of these accounts maintain an associated address in Savannah, Georgia.

22.     All business activities associated with TitleMax Funding have always occurred in either Savannah, Georgia; Carrollton, Texas; or Florida.

**Plaintiffs' Absence of Contacts in Pennsylvania**

23. TMX Finance and TitleMax Funding both operate exclusively outside of Pennsylvania.

24. Neither TMX Finance nor TitleMax Funding have ever had any offices, employees, or agents in Pennsylvania.  Nor has either entity ever been registered to do business in Pennsylvania.

25. In fact, TMX Finance and TitleMax Funding have never:

   a. owned or leased property in Pennsylvania;

   b. held a bank account in Pennsylvania;

   c. used employees or agents to solicit Pennsylvania business in person;

   d. held a certificate or license to do business in Pennsylvania;

   e. intentionally advertised or marketed toward Pennsylvania residents; or

   f. negotiated contractual relationships in Pennsylvania.

26. Further, TMX Finance and TitleMax Funding have never negotiated or entered into a contractual relationship with *any* consumer anywhere, much less consumers in Pennsylvania.

27. TMX Finance and TitleMax Funding never advertised or offered services to consumers at all and certainly never directed any sort of advertisements into Pennsylvania.

28. In short, the Secretary, through her agents at the Department, attempt to regulate TMX Finance and TitleMax Funding for originating loans to Pennsylvania loans when, in fact, they never made loans *at all to anyone*.

**A History of the Secretary's Interpretation and Enforcement of the LIPL and CDCA**

29.     The Department, by and through the Secretary, administers and enforces the LIPL and CDCA, among other statutes and regulations. *See* 41 Pa. C.S. § 506(b), (c); 7 Pa. C.S. § 6212.

30.     The LIPL and CDCA regulate the interest rates that may be charged on loans made in Pennsylvania. *See* 7 Pa. C.S. § 5203. Under the LIPL, the maximum interest rate on a Pennsylvania loan of $50,000 or less is 6% per year. 41 Pa. C.S. § 201. Under the CDCA, for loans of $25,000 or less, a lender may charge an interest rate up to approximately 24% per year if licensed by the Department. 7 Pa. C.S. §§ 6203(a), 6213. In sum, for loans made up to $25,000, an unlicensed lender can charge no more than 6% annual interest and a licensed lender can charge no more than approximately 24% annual interest. The CDCA expressly states that it only governs "persons" engaged "***in this Commonwealth*** . . . in the business of negotiating or making loans or advances of money or credit." 7 P.a. C.S. § 6203(A) (emphasis added).

31.     Until July 26, 2008, the Secretary of the Department and the Department had, through a series of interpretive letters, interpreted the phrase "in this Commonwealth" as necessarily excluding out-of-state lenders without any officers or employees in Pennsylvania, such that entities licensed in states outside of Pennsylvania could lend to Pennsylvania consumers through the mail or over the internet.

32.     On July 26, 2008, however, without any statutory amendment by the legislature, "[t]he Department announced that engaging in nonmortgage consumer lending to Pennsylvania residents by any means, including by means of the internet or by mail, constitutes engaging in such business in this Commonwealth as contemplated by" the CDCA. *Cash Am. Net of Nev. LLC v. Com., Dep't of Banking*, 8 A.3d 282, 286 (Pa. 2010) (internal quotations omitted)

(upholding the Department's new interpretation as correct regarding only the "specified types of loans in" that case: "short-term 'pay-day' loans to Pennsylvania residents made over the Internet"). This reinterpretation of a nearly 100-year-old statute without a statutory amendment authorizing it, Defendant contends, allows the Department to now regulate *any* out-of-state lender, even where they lack a physical presence in Pennsylvania, do not online lend to Pennsylvania consumers, and do not advertise to Pennsylvania consumers.

33.    Even more incredibly, in 2009 litigation before the Commonwealth Court of Pennsylvania in the *Cash America* case that preceded the Pennsylvania *Cash America* Supreme Court decision, the Department took the position expressly with the court "that if a Pennsylvania resident physically travels to Nevada to effect a loan from Cash America, the CDCA does not apply." *See Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*, 978 A.2d 1028, 2009 Pa. Commw. LEXIS 570, at *39 n.10 (Pa. Commw. Ct. July 10, 2009) (Leavitt, J. dissenting). Yet, without any warning, the Department suddenly flipflops and now asserts that the CDCA applies where Pennsylvania residents travel to stores owned by the various TitleMax Lending Entities in other states.

34.    The first time that TitleMax Funding learned about the Pennsylvania Secretary's intent to reverse the position taken with the Pennsylvania Commonwealth Court in *Cash America*, through her agents at the Department, was when TitleMax Funding received at its principal place of business in the mail a subpoena dated August 22, 2017, and directed to a generic, non-existent entity called, "TitleMax, TMX Finance | Family of Companies" (the "August 2017 Subpoena") at 15 Bull Street, Suite 200, Savannah GA 31401.

35.    Importantly, neither the formal entity TMX Finance LLC nor TitleMax Funding appeared on the face of that subpoena. Nor did the conduct on which the August 2017 Subpoena

requests focused appear remotely related to any business that either TMX Finance or TitleMax Funding conducted (as opposed to some of the lending business that the TitleMax Lending Entities conducted).  And of course, neither TMX Finance nor TitleMax Funding were subject to the jurisdiction of the Secretary or her Department.  Accordingly, they were not immediately engaged in a dispute with the Department at that time.

36.     Still, it became clear from this August 2017 Subpoena that the Secretary, through her agents at the Department, threatened to enforce the LIPL and the CDCA extraterritorially, even where lenders never originated loans inside Pennsylvania.  As a result, new policies were implemented by a corporate team in Georgia directly as a result of the Secretary's attempts to regulate conduct extra-territorially in Georgia.  Specifically, the TitleMax Lending Entities (i) stopped lending in any of their brick-and-mortar stores to Pennsylvania consumers, (ii) stopped collection activity on Pennsylvania consumer accounts, (iii) stopped placing "payment reminder" calls into Pennsylvania to Pennsylvania borrowers, and (iv) prohibited mailing collection letters into Pennsylvania in response to immediately after receiving the August 2017 Subpoena.  Ultimately, where TMX Finance files consolidated tax returns and where TitleMax Funding own bank accounts, these entities were impacted by these new policies.

37.     When the TitleMax Lending Entities did not comply under arguments that the Department lacked authority to enforce the LIPL and CDCA extraterritorially, the Secretary, through her agents at the Department, filed a miscellaneous action in Pennsylvania state court to enforce the August 2017 Subpoena *against TitleMax Funding and its affiliates in other states*, even though TitleMax Funding did not even appear on the face of the defective August 2017 Subpoena that was addressed to a generic, non-existent entity.  *See Pennsylvania v. TitleMax of*

9

*Del., Inc. et al.*, Docket No. 417 MD 2017.  TMX Finance LLC was not named as a defendant in that subpoena enforcement action.

38.    What is even more astounding, the Pennsylvania state court ordered the parties, ***including TitleMax Funding***, to comply.  *See id.*  Begrudgingly, TitleMax Funding did so, even though it felt harassed by a regulatory body in a state where it (i) was not registered, did not do business, and had no property or employees; (ii) did not conduct any lending business whatsoever anywhere in the world; and (iii) seemed unable to get a fair shake from that state's courts (given that a very obviously defective subpoena was ***still enforced against it***, despite improper service and the document failing to even name TitleMax Funding anywhere within its four corners).

## The Defendant's Voluminous Contact with Georgia

39.    The Defendant oversees the Department.  The Department is an executive Pennsylvania state agency, and the Secretary is a member of the Governor's cabinet.

40.    As discussed previously, in 2017, the Secretary, through her agents at the Department, mailed the August 2017 Subpoena into the territorial borders of Georgia to Savannah, the principal place of business for TMX Finance and TitleMax Funding.

41.    Since then, the Secretary, through her agents at the Department, has also mailed the June 2024 Subpoena into the territorial borders of Georgia to the principal place of business for TMX Finance and TitleMax Funding, seeking to obtain documents from (i) TitleMax of Delaware, Inc.; (ii) TitleMax of Ohio, Inc.; (iii) TitleMax of Virginia, Inc.; (iv) TitleMax of TitleMax of South Carolina, Inc.; (v) TitleMax Funding; (vi) TMX Finance; (vii) TMX Finance Corporate Services, Inc.; and (viii) CCFI Companies, LLC.  Critically, in addition to TMX Finance and TitleMax Funding having their principal places of business in Savannah, Georgia,

so, too, do TitleMax of Delaware, Inc.; TitleMax of Ohio, Inc.; TitleMax of Virginia, Inc.; TitleMax of South Carolina, Inc.; and TMX Finance Corporate Services, Inc.

42.     One week later, on June 14, 2024, the Secretary, through her agents at the Department, mailed the Order to Show Cause into the territorial and sovereign borders of Georgia to Savannah, which serves as the principal place of business for TMX Finance; TitleMax Funding; TitleMax of Delaware, Inc.; TitleMax of Ohio, Inc.; TitleMax of Virginia, Inc.; TitleMax of South Carolina, Inc.; and TMX Finance Corporate Services, Inc.

43.     Thus, the Department has now thrice availed itself of mailing legal process into the territorial and sovereign borders of Georgia for the purposes of regulating entities within the CCF Holdings, LLC corporate family tree.

44.     Moreover, the Defendant, in her official capacity as a representative of the Department and the Commonwealth of Pennsylvania, has extensive contacts with Georgia, which include but are not limited to the following:

     a.  communications into Georgia via mail, phone, the internet, e-mail, and other communication channels;

     b.  threatened enforcement of Pennsylvania laws against Georgia residents and businesses;

     c.  membership in conferences and groups that engage in nationwide regulatory efforts, including regulatory efforts targeted at Georgia;

     d.  extensive cooperation with Georgia state agencies and other arms of the Georgia government;

     e.  solicitation of complaints and grievances from Georgia residents; and

   f. advertising and publicizing of regulatory and legal actions taken against

    Georgia residents and businesses.

45. Moreover, the Defendant routinely transmits communications to Georgia and its residents using the Internet.  For example, the Defendant maintains a highly interactive website called the "Department of Banking and Securities" that advertises and publicizes its enforcement actions, including enforcement actions taken against out-of-state residents such as Plaintiffs, and is accessible from Georgia.  *See* Dep't of Banking & Secs., *2024 Enforcement Orders*, https://www.dobs.pa.gov/ForMedia/Pages/2024-Enforcement-Orders.aspx (last visited Aug. 12, 2024).

46. Indeed, Defendant's website publicizes the fact that it issued an Order to Show Cause to "TMX Finance LLC" and "TitleMax Funding, Inc." on June 14, 2024.

47. The Department's website solicits complaints and allows Georgia residents to interact with the website to file a complaint.  Dep't of Banking & Secs., *Filing a Complaint*, https://www.dobs.pa.gov/Consumers/Pages/File-a-Complaint.aspx (last visited Aug. 12, 2024).

48. The Department's website also asks users, no matter which state they reside in, to file a complaint (a) by calling "1.800.PA.BANKS"; (b) by mailing a complaint to the Department's headquarters in Harrisburg, Pennsylvania; or (c) by sending a fax.  *See id.*

49. The website emphasizes that "[c]omplaints are important as they allow DoBS to identify patterns of unfair or deceptive practices that may result in further action."  *See id.*  The "Filing a Complaint" page, which solicits complaints, does not limit eligible complainants to Pennsylvania residents or former Pennsylvania residents.  *See id.*

50. The Pennsylvania Attorney General has also taken steps to solicit Georgia residents through operation of a website.  For example, in a press release issued on October 14,

2022, related to a separate title lender, the Pennsylvania Attorney General's Office advertised an "important victory" over TitleMax in separate litigation in Delaware that had nothing to do with either TMX Finance or TitleMax Funding. *See* Pa. Att'y Gen., *AG Shapiro Gets $1.6 Million Back for Consumers Issued Illegal Car Title Loans*, https://www.attorneygeneral.gov/taking-action/ag-shapiro-gets-1-6-million-back-for-consumers-issued-illegal-car-title-loans/ (last visited Aug. 12, 2024). Following this press release, the then-Pennsylvania Attorney General invited "[c]onsumers [including in Georgia] who believe they have been taken advantage of by a similar car title lender [to] file a consumer complaint online or contact the Office of Attorney General by calling 1-800-441-2555 or by emailing scams@attorneygeneral.gov." *Id.*

51.     This press release even included a hyperlink that directs consumers, including in Georgia, to a webpage titled "Submit a Complaint." *See* Pa. Att'y Gen., *Submit a Complaint*, https://www.attorneygeneral.gov/submit-a-complaint/ (last visited Aug. 12, 2024). This webpage is highly interactive and permits residents from Georgia to file complaints, even if they do not reside in (and have never resided in) Pennsylvania. This webpage contains no restrictions or limitations on the geographic location of a complainant, nor does it discourage Georgia residents from filing complaints.

52.     Pennsylvania's outreach to Georgia residents through its suite of interactive websites, and its solicitation of "complaints" from Georgia residents about Georgia businesses is just one way in which the Defendant, her agency, and her State have developed substantial connections to Georgia and have attempted to influence business activities here.

53.     As a result of its solicitation, the Department received complaints about TitleMax Loan Providers that involved business transactions that occurred exclusively outside of

13

Pennsylvania and involved individuals who were not (and have never been) Pennsylvania residents.

54.     Additionally, Pennsylvania—through its regulatory agencies and law enforcement officials—has expressed a strong desire to regulate extra-territorial business activity, including activity in Georgia.  For example, while he was Pennsylvania's Attorney General, Pennsylvania Governor Josh Shapiro stated in 2022 that certain defendants "thought they could evade Pennsylvania laws" because they were "based in Delaware and Florida."  Pa. Att'y Gen., *AG Shapiro Gets $1.6 Million Back for Consumers Issued Illegal Car Title Loans*, https://www.attorneygeneral.gov/taking-action/ag-shapiro-gets-1-6-million-back-for-consumers-issued-illegal-car-title-loans/ (last visited Aug. 12, 2024).  Shapiro went on to proclaim, "But *I don't care where you are*, if you exploit Pennsylvania consumers, *you're going to hear from my office*."  *Id.* (emphasis added).  Attorney General Shapiro explained that prior settlements with title loan companies were partially intended to "put[] other bad actors on notice," no matter "where [they] are."  *Id.*  Governor Shapiro was the Attorney General when the August 2017 Subpoena was issued to Plaintiffs in 2017 and throughout the subsequent litigation around the validity of that document.

55.     There are innumerable other continuous and ongoing relationships and partnerships between the Department and Georgia as well.  For instance, the Defendant and the Department are also members of the Conference of State Bank Supervisors ("CSBS").  CSBS promotes cooperation between and engagement among Defendant and her counterpart in Georgia at the Department of Banking & Finance.

56. CSBS "serves as a forum for collaborating and developing policies that strengthen financial regulation." Conference of State Bank Supervisors, *2022 Annual Report*, at 2, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024).

57. Upon information and belief, CSBS also hosts regular events at locations around the country, many of which have taken place in Georgia, at which Defendant or members of her office meet with representatives from the Georgia Department of Banking & Finance. *See* Conference of State Bank Supervisors, *Calendar of Events*, https://www.csbs.org/previous-events (last visited Aug. 12, 2024).

58. Defendant's membership in CSBS results in substantial contacts with Georgia. These contacts come in many forms, such as the following:

    a. The Defendant has access to CSBS's Nationwide Multistate Licensing System (NMLS), which is an "online licensing, registration and supervisory platform." Conference of State Bank Supervisors, *2022 Annual Report*, at 5, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024). This system aids in "Networked Supervision," which allows the states (including Pennsylvania and Georgia) to "actively communicate as a ***federated unit***, sharing secure information instantly and with all regulator stakeholders simultaneously." Conference of State Bank Supervisors, *Networked Supervision*, https://www.csbs.org/networked-supervision (last visited Aug. 12, 2024). Plaintiffs believe and understand, and therefore allege, that Defendant utilizes NMLS to share information with regulatory counterparts in Georgia.

15

b. The Defendant participates in CSBS's State Examination System (SES). Conference of State Bank Supervisors, *2022 Annual Report*, at 9, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024). SES allows the Defendant to process consumer complaints and to "manage consumer complaints in a collaborative, networked manner that preserves state control over information sharing." *Id.* Defendant utilizes SES to share information with regulatory counterparts in Georgia.

c. The Defendant participates in CSBS's "One Company, One Exam" program, which is intended to "enabl[e] state coordination." Conference of State Bank Supervisors, *2022 Annual Report*, at 10, https://www.csbs.org/annual-reports-financials (last visited Aug. 12, 2024).

59. The Department is also a member of other similar groups, including the North American Securities Administrators Association, the National Association of Consumer Credit Administrators, and the Money Transmitter Regulators Association.

60. The Defendant has requested information from Georgia officials in the course of carrying out her official duties.

61. The Defendant has provided information to Georgia officials in the course of carrying out her official duties.

62. Beyond CSBS, the Defendant (or her office) is a party to many multi-state agreements that include Georgia. *See* Conference of State Bank Supervisors, *Cooperative Agreements*, https://www.csbs.org/cooperative-agreements (last visited Aug. 12, 2024). These nationwide cooperative agreements obligate the Defendant to "cooperate" and "communicate"

with her counterparts in Georgia regarding multi-state banks and other multi-state financial institutions.  *E.g.*, Conference of State Bank Supervisors, *Nationwide Cooperative Agreement* (rev. Dec. 9, 1997), https://www.csbs.org/cooperative-agreements (last visited Aug. 12, 2024). In addition to these cooperative agreements, the Defendant (or her office) is also a party to a range of "information sharing" agreements that require or encourage multi-state communications, including communications with Georgia.

63.     Moreover, the Department or the State of Pennsylvania, including the Pennsylvania Attorney General's office, routinely participates in the prosecution of multi-state Attorney General investigations and lawsuits that target Georgia companies.  Most recently, the Pennsylvania Attorney General's office announced a $17.5 million negotiated multi-state settlement with a Georgia-based company that was negotiated alongside the Georgia Attorney General.

### The Defendant's Specific Contact with Georgia Related to this Matter

64.     Unrestrained and emboldened by the Pennsylvania Commonwealth Court ordering TitleMax Funding to comply with a subpoena it did not even appear upon, the Secretary, through her agents at the Department, has doubled- and tripled-down on her unbridled aggression and efforts to regulate TitleMax Funding.  In addition, she has now also placed TMX Finance in her cross hairs for business conducted primarily *within Georgia's territorial and sovereign borders and exclusively outside of Pennsylvania*.

65.     As discussed previously, in 2017 the Secretary, through her agents at the Department, mailed the August 2017 Subpoena into the territorial borders of Georgia to the principal place of business for TMX Finance and TitleMax Funding in Savannah.

66.     Since then, the Secretary, through her agents at the Department, has also mailed the June 2024 Subpoena into the territorial borders of Georgia to the principal place of business for TMX Finance and TitleMax Funding, seeking to obtain documents from (i) TitleMax of Delaware, Inc.; (ii) TitleMax of Ohio, Inc.; (iii) TitleMax of Virginia, Inc.; (iv) TitleMax of TitleMax of South Carolina, Inc.; (v) TitleMax Funding; (vi) TMX Finance; (vii) TMX Finance Corporate Services, Inc.; and (viii) CCFI Companies, LLC.  Critically, in addition to TMX Finance and TitleMax Funding having their principal places of business in Savannah, Georgia, so, too, do TitleMax of Delaware, Inc.; TitleMax of Ohio, Inc.; TitleMax of Virginia, Inc.; TitleMax of South Carolina, Inc.; and TMX Finance Corporate Services, Inc.

67.     One week later, on June 14, 2024, the Secretary, through her agents at the Department, mailed the Order to Show Cause into the territorial and sovereign borders of Georgia to Savannah, which serves as the principal place of business for TMX Finance; TitleMax Funding; TitleMax of Delaware, Inc.; TitleMax of Ohio, Inc.; TitleMax of Virginia, Inc.; TitleMax of South Carolina, Inc.; and TMX Finance Corporate Services, Inc.

68.     Thus, the Department has now thrice availed itself of mailing legal process into the territorial and sovereign borders of Georgia with respect to these efforts at regulating entities within the CCF Holdings, LLC corporate family tree.

69.     Had the Department properly served each legal entity with its own unique copy of the August 2017 Subpoena, the June 2024 Subpoena, and the Order to Show Cause, as she was obligated to do had she followed the rules of procedure for service, the Secretary would have sent legal process into the territorial and sovereign borders of Georgia *dozens of times*—all of which would have been related to its efforts to regulate the TitleMax Lending Entities' business activities.

70.     The Secretary's gamesmanship in attempting to evade rule-based service obligations should not be countenanced.

71.     For instance, with respect to the June 2024 Subpoena, the vague and generic "Community Choice Financial Family of Brands" is not a legal entity.

72.     Nor does the June 2024's addressing to the "Legal Department" succeed because neither TMX Finance nor TitleMax Funding have a "Legal Department" situated within their respective organizations.

73.     The Secretary, through her agents at the Department, furnished a copy of the June 2024 Subpoena to the law firm of Holland & Knight, predecessor counsel for TitleMax Funding in the miscellaneous action the Department filed related to enforcement of the August 2017 Subpoena.  However, Holland & Knight did not have authority from TitleMax Funding to accept service of the June 2024 Subpoena and did not do so.

74.     Further, Holland & Knight did not even represent TMX Finance because they were not a named defendant in that Pennsylvania action.  Obviously, then, they did not have authority to accept service either (and did not do so).

75.     Addressed to the non-existent entity "Community Choice Family of Brands," the June 2024 Subpoena commands the vague, generic, and non-existent "Community Choice Family of Brands" to produce documents and information on behalf of another generic entity styled "TitleMax," which does not legally exist.  The June 2024 Subpoena then proceeds to define "TitleMax" to encompass TMX Finance and TitleMax Funding, as well as an array of other affiliate and/or subsidiary entities.

76.     Importantly, the June 2024 Subpoena was not served in a manner compliant with either Pennsylvania law *or* Georgia law—let alone, both.  Indeed, it was not domesticated in Georgia.

77.     The June 2024 Subpoena seeks voluminous records belonging to Plaintiffs and other named entities pursuant to the Department's purported authority to investigate potential violations of LIPL and the CDCA.

78.     The June 2024 Subpoena seeks such documents for a 7-year period running from August 23, 2017, through the present.

79.     On June 14, 2024, the Secretary, through her agents at the Department, furnished a copy of the June 2024 Subpoena to the law firm of Holland & Knight, predecessor counsel for TitleMax Funding in the miscellaneous action the Department filed related to enforcement of the August 2017 Subpoena.  Again, though, Holland & Knight did not have authority from TitleMax Funding to accept service of the Order to Show Cause and did not do so.

80.     And, again, Holland & Knight did not represent TMX Finance and so did not have authority to accept service either (and did not do so).  On June 18, 2024, the Order to Show Cause also arrived in the mail at 15 Bull Street, Suite 200, Savannah, GA 31401.  This address is the principal place of business for many of the entities identified, including for TMX Finance and TitleMax Funding.

81.     Again, the Order to Show Cause was not served on Plaintiffs in a manner compliant with either Pennsylvania law *or* Georgia law—let alone, both.

82.     Nevertheless, the Order to Show Cause demands that Plaintiffs answer and explain "why the Banking and Securities Commission ('Commission') should not impose" civil penalties that total more than $52.7 million for alleged violations of the LIPL and CDCA—

20

which allegedly arise out of loans made to Pennsylvania customers by the TitleMax Lending

Entities.  To be clear, none of these loans at issue were made by TMX Finance or TitleMax

Funding.

83.    The Order to Show Cause does not provide any basis upon which to pierce the

corporate veil and impose liability on TMX Finance or TitleMax Funding for any business

activity undertaken by their affiliates or subsidiaries.

84.    In sum, the Secretary's harassing, vexatious, and continuous efforts to regulate

extraterritorially inside the sovereign borders of Georgia over the past 7 years regarding activity

the occurred exclusively outside of Pennsylvania, through issuance of the August 2017

Subpoena, the August 2024 Subpoena, and the Order to Show Cause, must be stopped.  The June

2024 Subpoena, and Order to Show Cause were purposely directed at Georgia-based entities and

business conducted in Georgia.

85.    TMX Finance and TitleMax Funding's failure to respond to the Order to Show

Cause can result in entry of a default order and finding that all allegations of fact are deemed

admitted.

86.    For these reasons, Plaintiffs must come here seeking this Court's protection from

the Defendant's unconstitutional overreach and abuses.

<u>**COUNT I**</u>
**VIOLATION OF 42 U.S.C. § 1983**
**UNDER THE DORMANT COMMERCE CLAUSE**

87.    TMX Finance and TitleMax Funding incorporate the allegations set forth above

as if fully set forth herein.

88.     Known as the "Commerce Clause," Article 1, Section 4 of the U.S. Constitution provides, "The Congress shall have Power . . . to regulate Commerce with foreign Nations, ***and among the several States*** . . . ."  U.S. art. I, § 4 (emphasis added).

89.     The U.S. Supreme Court has held that "the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contains a further, negative command,' one effectively forbidding the enforcement of 'certain state economic regulations even when Congress has failed to legislate on the subject."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (quoting *Okla. Tas Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995)).

90.     The Supreme Court has further held as follows:

Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State, . . . .  Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statutes' extraterritorial reach was intended by the legislature.  The critical inquiry is whether the practical effects of the regulation is to control conduct beyond the boundaries of the State.  Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.  Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another State.  And specifically, the Commerce Clause dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another.

*Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336–37 (1989).

91.     Section 1983 creates a civil cause of action where any person "under color of any statute, ordinance, regulation, custom, or usage, of any State" denies any person within the United States of a constitutional right or privilege.  42 U.S.C. § 1983.

92.     The Secretary, in her official capacity as the chief executive and administrative officer of the Department, is a "person" for purposes of 42 U.S.C. § 1983.

93.     The Secretary, in her official capacity as the chief executive and administrative officer of the Department, issued the June 2024 Subpoena and Order to Show Cause under color of Pennsylvania law.

94.     As described in greater detail above, TMX Finance and TitleMax Funding have no offices or employees in Pennsylvania and do not conduct any business in Pennsylvania. Every one of the loans at issue in the Order to Show Cause and that are the subject of the June 2024 Subpoena were originated "wholly outside" the territorial boundaries of Pennsylvania by other corporate entities—not TMX Finance or TitleMax Funding.  As noted, neither TMX Finance nor TitleMax Funding offered loans to any consumers *at all*.

95.     Nor has the Secretary provided any factual basis upon which to pierce the corporate veil and impose liability upon TMX Finance or TitleMax Funding for business conduct of its subsidiaries or affiliates.

96.     Therefore, the Defendant, through her agents in the Department, is attempting to regulate "commerce that takes place wholly outside of [Pennsylvania]'s borders," which "the Commerce Clause precludes."  *See Healy*, 491. U.S. at 336; *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (applying *Healy* to invalidate Indiana's regulation of Illinois-based automobile title lender in similar circumstances); *see also FieldTurf USA Inc. v. TenCate Thiolon Middle East, LLC*, No. 4:11-CV-50-TWT, 2011 WL 13234177, at *5 (N.D. Ga. Dec. 20, 2011) ("A state's laws may not be applied to conduct that occurs outside that state") (citation omitted).

97.     Put simply, the Secretary, through her agents at the Department, is attempting to reach beyond the bounds of the Commonwealth of Pennsylvania to regulate applicable interest

rates in the State of Georgia, even though the permissible interest rates in the State of Georgia fall squarely within the law-making authority, discretion, and prerogative of Georgia's legislature.

98.    Accordingly, the Defendant's efforts to regulate TMX Finance and TitleMax Funding under the LIPL and CDCA violate the Dormant Commerce Clause embedded at Article I, Section 8 of the U.S. Constitution.  For that reason, declaratory and permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate.  *See* 42 U.S.C. § 1988.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1983
## UNDER THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE

99.    TMX Finance and TitleMax Funding re-allege and incorporate the allegations set forth above as if fully set forth herein.

100.    The Fourteenth Amendment to the U.S. Constitution guarantees, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV.

101.    By issuance of the June 2024 Subpoena and Order to Show Cause, the Secretary attempts to regulate commercial activity that takes place wholly outside the Commonwealth of Pennsylvania.

102.    As described in greater detail above, TMX Finance and TitleMax Funding have no offices or employees in Pennsylvania, do not conduct any business in Pennsylvania, and do not advertise in Pennsylvania.

103.    The issuance of the June 2024 Subpoena and Order to Show Cause deprives TMX Finance and TitleMax Funding of their rights under the Due Process Clause embedded within the

Fourteenth Amendment to the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

104.    "The Fourteenth Amendment's Due Process Clause limits a state's power to exercise jurisdiction over a" company who is not a resident in the state.  *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 592 U.S. 351, 358 (2021).  Where a state's "assertion of jurisdiction exposes defendants to the State's coercive power, it is subject to review for compatibility with the Fourteenth Amendment's Due Process Clause."  *Bristol-Myer Squibb Co. v. Super. Court of Cal.*, 582 U.S. 255, 261 (2017) (citations and quotation marks omitted).  Furthermore, "even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."  *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294 (1980)).

105.    TMX Finance and TitleMax Funding are not incorporated in Pennsylvania, do not have principal places of business in Pennsylvania, and are not licensed or registered to do business in Pennsylvania.  Plaintiffs are, therefore, not "at home" in Pennsylvania.  They also do not make consumer loans.  Nor are there any allegations upon which to pierce the corporate veil and impose liability on TMX Finance or TitleMax Funding for any actions of their subsidiaries or affiliates.

106.    And, as described in greater detail above, TMX Finance and TitleMax Funding have no offices or employees in Pennsylvania, do not conduct any business in Pennsylvania, and

do not advertise in Pennsylvania.  Every one of the loans at issue in the Order to Show Cause and that are the subject of the June 2024 Subpoena were originated outside the territorial and sovereign boundaries of Pennsylvania—and therefore "wholly outside" the territorial boundaries of Pennsylvania.  And none of the loans at issue were originated by TMX Finance or TitleMax Funding.  Given Plaintiffs' lack of contact with Pennsylvania, the Department's attempt to apply Pennsylvania law—including LIPL and CDCA—offends the "traditional notions of fair play and substantial justice" assured by the Due Process Clause.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

107.    Consequently, the threatened extraterritorial imposition of Pennsylvania law on TMX Finance and TitleMax Funding violates the Due Process Clause.  *See id.* (explaining that the Due Process Clause requires "certain minimum contacts with [the state]" such that the exercise of personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"); *see also Silverman v. Berkson*, 661 A.2d 1266 (N.J. 1994) (holding that the Due Process Clause bars a state agency from enforcing a subpoena against an out-of-state entity that does not have sufficient "minimum contacts" with the state).

108.    In addition, under the U.S. Supreme Court's due process jurisprudence, "A State cannot punish a defendant for conduct that may have been lawful where it occurred."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003).  Moreover, since "[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State," a state's violation of this principle violates the Fourteenth Amendment's Due Process Clause.  *See Bigelow v. Virginia*, 472 U.S. 797, 811, 821–22 (1975).

26

109.    Accordingly, the Defendant's application of Pennsylvania law to TMX Finance and TitleMax Funding, businesses that operate exclusively outside of Pennsylvania, that have no employees in Pennsylvania, that have no stores in any state, let alone in Pennsylvania, that are not "at home" in Pennsylvania, and that originated no loans in Pennsylvania or *at all* would offend substantial notions of "fair play and substantial justice" in violation of the Fourteenth Amendment to the U.S. Constitution.  For that reason, declaratory and permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate.  *See* 42 U.S.C. § 1988.

## COUNT III
### VIOLATION OF 42 U.S.C. § 1983
### UNDER THE FULL FAITH AND CREDIT CLAUSE OF THE U.S. CONSTITUTION

110.    TMX Finance and TitleMax Funding re-allege and incorporate by reference the allegations of the preceding paragraphs of this Complaint.

111.    The Full Faith and Credit Clause in Article IV of the U.S. Constitution guarantees, "Full Faith and Credit shall be given in each State to the public Acts, Record, and judicial Proceedings of every other State."  U.S. art. IV, § 1.  Under the Full Faith and Credit Clause, each state must give "Full Faith and Credit" to "the public Acts" of "every other State," such as other states' statutes.  *See Franchise Tax Bd. v. Hyatt*, 578 U.S. 171, 178–79 (2016).

112.    As relevant here, Georgia has adopted the Uniform Interstate Depositions and Discovery Act ("UIDDA").  *See* Ga. Code § 24-13-110 *et seq.*  The Georgia UIDDA statute requires that those from outside of Georgia wishing to serve a subpoena issued by a foreign jurisdiction on an entity located inside Georgia must domesticate the subpoena by submitting "a foreign subpoena to the clerk of the superior court of the county in which the person receiving

the subpoena resides." Ga. Code § 24-13-112.  Georgia's UIDDA also provides that a recipient

of a domesticated subpoena within Georgia has the right to move to quash, narrow, or otherwise

challenge any such legal process in its home courts.  *See id.* at § 24-13-116.

113.    By the same token, Pennsylvania has adopted a virtually identical UIDDA statute

in the Commonwealth of Pennsylvania.  *See* 42 Pa. C.S. § 5331 *et seq.*  Just like Georgia's law,

Pennsylvania requires domestication of a foreign subpoena through a Pennsylvania public

official: "[t]o request issuance of a subpoena under this section, a party must submit a foreign

subpoena to a prothonotary in the jurisdiction in which the person who is the subject of the order

resides, is employed or regularly transacts business in person."  42 Pa. C.S. §§ 5333, 5335(a).

Pennsylvania's UIDDA, exactly like Georgia's UIDDA, permits a recipient of a domesticated

foreign subpoena inside Pennsylvania to move to quash, narrow, or otherwise challenge the legal

process in Pennsylvania courts.  42 Pa. C.S. § 5337(a).

114.    Despite the existence of the Georgia's UIDDA statute and despite Pennsylvania

having a virtually identical statute with which it would expect those serving foreign subpoenas

inside Pennsylvania to comply, the Department did not honor Georgia's UIDDA statute and

domesticate the June 2024 Subpoena in Georgia pursuant to Ga. Code § 24-13-112.

115.    The Department's failure to do so constitutes a "constitutionally impermissible

'policy of hostility' to the public Acts of a sister state."  *See Hyatt*, 578 U.S. at 179.

116.    Accordingly, the Defendant has violated the Full Faith and Credit Clause of the

U.S. Constitution through her failure to abide by the "public Acts," statutes, and judicial decrees

of Georgia.  U.S. Const. art. IV, § 1; *Hyatt*, 578 U.S. at 179.  For that reason, declaratory and

permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of

28

attorney's fees and costs should be entered against the Defendant as warranted and appropriate. *See* 42 U.S.C. § 1988.

<u>COUNT IV</u>
**VIOLATION OF 42 U.S.C. § 1983
UNDER THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE**

117.    TMX Finance and TitleMax Funding re-allege and incorporate by reference the allegations of the preceding paragraphs in this Complaint.

118.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

119.    In the event Pennsylvania is deemed to have jurisdiction over TMX Finance and TitleMax Funding, the enforcement of the LIPL and CDCA against TMX Finance and TitleMax Funding denies Plaintiffs equal protection of the laws in violation of the Equal Protection Clause.

120.    As discussed previously, Pennsylvania has adopted a UIDDA statute in the Commonwealth of Pennsylvania that is virtually identical to Georgia's UIDDA statute.  *See* 42 Pa. C.S. § 5331 *et seq.*  Under Pennsylvania's UIDDA, Pennsylvania has required domestication of a foreign subpoena through a Pennsylvania public official: "[t]o request issuance of a subpoena under this section, a party must submit a foreign subpoena to a prothonotary in the jurisdiction in which the person who is the subject of the order resides, is employed or regularly transacts business in person."  42 Pa. C.S. §§ 5333, 5335(a).  It follows then that other "person[s] within [Pennsylvania's] jurisdiction" would receive the "protection" afforded by the UIDDA statute.

121.    Yet, by not honoring Georgia's UIDDA, the Defendant, through agents at the Department, are not affording Plaintiffs, other "person[s]" who the Department claims are

29

"within its jurisdiction," the same "protection" afforded by UIDDA through the failure to domesticate the June 2024 Subpoena.

122.    Accordingly, the Department is discriminating against nonresident companies, like TMX Finance and TitleMax Funding, and denying such nonresident companies equal protection of the laws.  There is no rational basis for such governmental discrimination and to deny Plaintiffs the protections guaranteed by UIDDA.

123.    Accordingly, the Defendant has violated the Equal Protection Clause embedded in the Fourteenth Amendment to the U.S. Constitution.  U.S. Const. amend. 14.  For that reason, declaratory and permanent injunctive relief should be entered.  *See* 42 U.S.C. § 1983.  In addition, an award of attorney's fees and costs should be entered against the Defendant as warranted and appropriate.  *See* 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, TMX Finance LLC and TitleMax Funding, Inc. respectfully request that this Court:

a.    Enter a judgment declaring that the Commerce Clause, Due Process Clause, Full Faith and Credit Clause, and Equal Protection Clause of the U.S. Constitution render the Defendant's June 2024 Subpoena null and void;

b.    Enter a judgment declaring that the Commerce Clause, Due Process Clause, Full Faith and Credit Clause, and Equal Protection Clause of the U.S. Constitution bar any further action on the Order to Show Cause;

c.    Enter a permanent injunction restraining the Secretary—as well as her officers, agents, servants, employees, and attorneys—from enforcing the June 2024 Subpoena;

30

d.      Enter a preliminary and permanent injunction restraining the Secretary—as well as her officers, agents, servants, employees, and attorneys—from enforcing the Order to Show Cause and continuing any related administrative hearings;

e.      Preliminarily and permanently enjoining the Defendant, her officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction from initiating any action to enforce the June 2024 Subpoena, to enforce the Order to Show Cause, or to further regulate TMX Finance and TitleMax Funding;

f.      An award to Plaintiffs of their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

g.      Award any and all other such relief as the Court may deem just and proper.


Dated: August 13, 2024


Respectfully submitted,

*/s/ Harold D. Melton*

Harold D. Melton (Ga. Bar No. 501570)
Charles E. Peeler (Ga. Bar No. 570399)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
Tele: (404) 885-3000
Fax: (404) 885-3900
harold.melton@troutman.com
charles.peeler@troutman.com

Robert A. Angle (*pro hac vice motion forthcoming*)
Ryan J. Strasser (*pro hac vice motion forthcoming*)

Timothy L. McHugh (*pro hac vice motion forthcoming*)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1200
(804) 697-1290
robert.angle@troutman.com
ryan.strasser@troutman.com
tim.mchugh@troutman.com

*Counsel to Plaintiffs TMX Finance LLC and TitleMax Funding, Inc.*